## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KENNETH L. HUDOCK, et al.    :
            :
            :
  v.         :  Civil No. CCB-14-2258
            :
            :
KENT COUNTY      :
BOARD OF EDUCATION   :
            :

## MEMORANDUM

Kenneth L. Hudock and Cheryl F. Vauls formerly served as principals of two elementary schools operated by the Kent County Board of Education (the "Board"). They now sue their former employer, alleging a host of wrongful termination and discrimination claims under state and federal law. The Board moves to dismiss their claims under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment under Federal Rule of Civil Procedure 56. Hudock and Vauls, in turn, move to deny or delay judgment against them under Rule 56(d), arguing they require discovery to obtain the facts necessary to oppose the Board's motion. And the Board seeks to sever Hudock's and Vauls' cases in the event its dispositive motion is denied. Those motions have been fully briefed and no hearing is necessary to their resolution. *See* Local Rule 105.5 (D. Md. 2014). For the reasons explained below, both the Board's motion to dismiss and Hudock's Rule 56(d) motion will be granted in part and denied in part, while the Board's motion to sever will be denied.

## BACKGROUND

Hudock, an educator with 25 years of experience, served as principal of the Board's

Worton Elementary School ("Worton") from 2007 through June 24, 2013, when he was told the Board would not renew his contract for the coming year. (*See* Compl. ¶¶ 13–14, ECF No. 1; Opp. Mot. Dismiss Ex. 5, Hudock Aff. ¶¶ 4, 14, ECF No. 18-7.) Vauls, an African-American educator with 40 years of experience, served as principal of the Board's H.H. Garnett Elementary School ("Garnett") from 2008 through June 25, 2013, until she, too, was told her contract would not be renewed. (*See* Compl. ¶¶ 36–37; Opp. Mot. Dismiss Ex. 1, First Vauls Aff. ¶¶ 5, 11, ECF No. 18-2.) In mid-July 2014, Hudock and Vauls filed suit in this court, contesting the lawfulness of the Board's decisions. Specifically, both allege the Board discriminated against them on the basis of age in violation of the federal Age Discrimination in Employment Act ("ADEA") and Maryland's Fair Employment Practices Act ("FEPA"). (*See* Compl. Counts I, II.) They also claim wrongful termination, alleging they were denied procedural protections guaranteed by Maryland statute. *See* Md. Code Ann., Educ. § 6-202; (Compl. Count XII.) In addition, Hudock alleges the Board discriminated against him on the basis of gender in violation of Title VII, Maryland's FEPA, and Article 46 of Maryland's Declaration of Rights, and on the basis of his gender and age in violation of Article 24 of Maryland's Declaration of Rights and a separate state statute, Md. Code Ann., Educ. § 6-104. (*See* Compl. Counts III–VII.) Meanwhile, Vauls alleges the Board discriminated against her on the basis of race in violation of Title VII, 42 U.S.C. § 1981, Title VI, Maryland's FEPA, and Md. Code Ann., Educ. § 6-104. (*See* Compl. Counts VIII–XI.)

Roughly six weeks after Hudock and Vauls filed their complaint—and before issuance of any scheduling order or the beginning of formal discovery—the Board moved to dismiss that complaint or, in the alternative, for summary judgment. (*See* Mot. Dismiss, ECF No. 7.) For

support, it appended affidavits and other exhibits to its motion.  Hudock's and Vauls' opposition, in turn, includes still more affidavits and other documentation.

It is undisputed that, in late 2012, Dr. Barbara Wheeler, the Board's Superintendent, announced she would not renew her contract with the Board upon the completion of her term on June 30, 2013.  (*See* Mot. Dismiss Ex. 55, First Silver Aff. ¶ 6, ECF No. 7-56; Opp. Mot. Dismiss Ex. 2, Wheeler Aff. ¶ 6, ECF No. 18-3.)  After that announcement, Wheeler became ill, forcing her to undergo emergency surgery and, afterward, extensive therapy.  (*See* Wheeler Aff. ¶¶ 7, 8.)  With the Board's permission, Wheeler began working from home in spring 2013.  (*Id.* at ¶ 8.)  The Board eventually selected Karen Couch to replace Wheeler as superintendent, beginning July 1, 2013.  (*See* Williams Aff. ¶ 7.)  As Edward Silver, the Board's Supervisor of Educational Services, explained in an affidavit, Wheeler's "limited capacity" in the months before Couch's arrival meant that he "often was called upon to perform some of the duties associated with her position."  (First Silver Aff. ¶ 7.)  Both Silver and Bryan Williams, the Board's President, stated in affidavits that Wheeler had entirely relinquished her duties as of June 17, 2013, when she returned to the Board certain electronic equipment, access cards, and the car the Board had provided to her.  (*See* First Silver Aff. ¶ 8 & n.3; Williams Aff. ¶ 9.)  Accordingly, Silver and Williams state, the Board expressly delegated to Silver several of Wheeler's responsibilities until the incoming superintendent, Couch, assumed office the following month.  (First Silver Aff. ¶ 8; Williams Aff. ¶ 10.)  In an email sent to Couch on June 19, Silver wrote that, during a conversation with Bryan Williams the previous night, "he asked me to be the designee . . . before you arrive."  (Mot. Dismiss Ex. 12, ECF No. 7-13.)

In an affidavit, however, Wheeler offers a contrary account of events surrounding her

3

retirement.  According to Wheeler, she remained in her position and performed her duties "throughout June 2013."  (Wheeler Aff. ¶ 8.)  Until the expiration of Wheeler's contract on June 30, Silver remained Supervisor of Education Services; she never appointed him to serve as interim superintendent on her behalf.  (*Id.* at ¶ 10–12.)  Although Wheeler acknowledges returning certain property to the Board on June 17, she explains that she did so "because [she] wanted to make sure that [her] hard drive was not compromised."  (*Id.* at ¶ 43.)  In the period between June 17 and June 30, Wheeler continued to perform her job duties, dealing with matters pertaining to operations and transportation and signing paychecks, "including one to Ms. Vauls for her accumulated annual leave."  (*Id.* at ¶ 44.)

In his affidavit, Williams states that the decision not to renew Hudock's or Vauls' contracts was largely driven by the poor performance of students at their schools on standardized tests.  (*See* Williams Aff. ¶¶ 11, 13.)  That standardized testing data is summarized in a document Silver created in fall 2013, long after Hudock's and Vauls' non-renewal.  (*See* First Silver Aff. ¶¶ 10, 11; *see also* Mot. Dismiss Ex. 55, First Silver Aff. Ex. G, Academic Achievement Summary 1, ECF No. 7-56.)  That data, Silver explained, is used to calculate whether a school has met certain previously established "Annual Measurable Objectives" ("AMOs"), which "set as a target reducing by one half the gap between present performance" of certain demographic subgroups within a school "and a 100% measure by the year 2017."  (*See* Academic Achievement Summary 1.)  Such a "measure" is achieved when "100% of [the school's] subgroups achieve proficient to advanced" scores on certain components of the Maryland State Assessments ("MSAs").  (*Id.*)  A school's satisfaction of its AMOs, in turn, is used to calculate its School Progress Index ("SPI").  (*Id.*)  Schools with an SPI score lower than 0.9 are designated "Strand 5" schools, the category

reserved for schools demonstrating the least progress, even if they have met certain other objectives. (*Id.*) According to Silver, Worton and Garnett were Strand 5 schools on the basis of the 2012–2013 test score data. (First Silver Aff. ¶ 12; Academic Achievement Summary 1, 3.) They were the Board's only schools falling into that category; the Board's remaining three elementary schools and its high school fell into Strands 2 or 3. (Academic Achievement Summary 3.) The principal of the only Board school to fall into Strand 4—the Kent County Middle School—resigned in the summer of 2013, before Hudock and Vauls were informed that their contracts would not be renewed. (*See* First Silver Aff. ¶ 15; *see also* Academic Achievement Summary 3; Mot. Dismiss, Ex. 1, ECF No. 7-2; Mot. Dismiss, Ex. 2, 6/3/13 Bd. Minutes 2, ECF No. 7-3.)

According to the Board's "Master Plan," the "[r]emoval of ineffective teachers and leadership" is appropriate for schools that fall into Strand 5. (*See* First Silver Aff. ¶ 14; *see also* Mot. Dismiss Ex. 55, First Silver Aff. Ex. I, Master Plan 2, ECF No. 7-56.) Accordingly, Silver's summary of the data concluded "[t]he removal of the principals at [Worton] and [Garnett] could be justified by reviewing the student achievement data and looking at the lack of progress in moving these schools forward." (First Silver Aff. ¶ 14 (alterations in original) (quoting Academic Achievement Summary 2).)

In his affidavit, Silver states that he compiled his summary of the data "after reviewing and analyzing the results of the 2013" MSAs, which he appended to his affidavit. (First Silver Aff. ¶ 11.) Those "results" appear to be printouts from a website that describes itself as a "site . . . created to help schools analyze their state assessment data and guide them in making data-based instructional decisions . . . ." School Improvement in Maryland,

http://mdk12.org/interact/index.html (last visited Feb. 26, 2015).  Those printouts indicate that

the data on the site were last updated in early October 2013, but do not explain when that data

first became available.  (*See* Mot. Dismiss Ex. 55, First Silver Aff. Ex. H, Data Printouts, ECF

No. 7-56.)  Whenever those MSA results first became publicly available or were posted to the

website, however, Wheeler notes that she, Silver, Hudock, Vauls, and other school officials

learned of certain scores in spring 2013.  (*See* Wheeler Aff. ¶ 33.)  Vauls claims that, although

MSA results had been distributed to the administration on June 14, SPI scores had not yet been

calculated at the time her contract was not renewed.  (*See* First Vauls Aff. ¶ 9.)  Hudock

corroborates Vauls' account, stating SPI scores were unavailable at the time of his termination.

(*See* Hudock Aff. ¶ 26.)

    In any case, according to the data on which Silver's analysis relies, the proportion of

Worton students achieving advanced or proficient scores dropped between 2011 and 2013 in

math, science, and reading, with greater decreases among African-American students than

among the general population of the school.  (*See* Data Printouts at 1–3.)  At Garnett, results on

the reading exam were roughly flat between 2011 and 2013, but dropped in math and science,

again with greater decreases among African-American students.  (*See id.* at 10–12.)

    In a separate affidavit, however, Wheeler minimizes the significance of testing data for

the 2012–2013 school year.  As she explains, that period was a "field test year" for a new

evaluation system for principals.  (Wheeler Aff. ¶ 29.)  Accordingly, it was also a "'no fault'

year for measuring principals' job performance as they pertained to student MSA results."  (*Id.*)

In the future, MSA results in reading and math, as well as SPI scores, would account for a

comparatively small proportion of elementary principals' evaluations.  (*Id.*)  An article appended

to the opposition corroborates Wheeler's account, (*see* Opp. Mot. Dismiss, Ex. 4, ECF No. 18-5), as does Hudock, (*see* Hudock Aff. ¶ 8).  According to Hudock, when Silver applied the new evaluation system to him, including Worton's scores on the 2012–2013 MSAs, Hudock "received a score of 79, placing me well within the 'effective' range."  (*Id.*)

Other concerns with Hudock's and Vauls' performance supported the decision not to renew their contracts.  Parents of Worton students, for example, complained of lax discipline at the school and Hudock's inadequate response to their complaints.  (*See* Williams Aff. ¶ 12.) Two letters—one from the parent of a Worton student, the other from a grandparent—as well as the minutes of two Board meetings in early 2012, corroborate those concerns.  (*See* Mot. Dismiss Exs. 18, 19, 20, 21, ECF Nos. 7-19, 7-20. 7-21, 7-22.)  In addition, Wheeler wrote Hudock an email and a separate memorandum expressing her dissatisfaction with the quality of instruction and the physical plant at Worton, based on her personal observation of the school, (*see* Mot. Dismiss Exs. 22, 24, ECF No. 7-23, 7-25), as well as another email criticizing his handling of a specific meeting with parents, (*see* Mot. Dismiss Ex. 23, ECF No. 7-24).  Similarly, representatives of the Maryland Coalition for Inclusive Education observed Worton's classrooms and provided constructive criticism on the basis of their observations.  (*See* Mot. Dismiss, Ex. 28, ECF No. 7-29.)  In a phone call to Silver, the Director of that organization allegedly complained that Hudock failed to cooperate with her staff during their evaluation of Worton. (Mot. Dismiss Ex. 29, Quirk Notes 2, ECF No. 7-30.)[1]  And several of Wheeler's annual reviews of Hudock's performance—which graded him as satisfying or failing to satisfy several separate performance standards—reveal some dissatisfaction with his administration of Worton.  (*See*

---

[1] Although there is no definitive indication of when that call took place, the memorandum summarizing it is dated November 15, 2013—months after the non-renewal of Hudock's contract.  (*See id.* at 1.)  In his affidavit, Silver refers to that document as his "Contemporaneous Notes" of the conversation with the Director, indicating that the conversation itself postdated the Board's decision as to Hudock's contract.  (First Silver Aff. ¶ 17.)

Mot Dismiss Ex. 30, Hudock 2009–2010 Performance Review, ECF No. 7-31; Mot. Dismiss Ex. 31, Hudock 2010–2011 Performance Review, ECF No. 7-32; Mot. Dismiss Ex. 32, Hudock 2011–2012 Performance Review, ECF No. 7-33.)[2]  For the 2009–2010 school year, Hudock failed to meet one of the six standards.  (*See* Hudock 2009–2010 Performance Review 6.)  The next year, he again failed to meet one of the standards and only "partially met" another.  (*See* Hudock 2010–2011 Performance Review 5.)  And the year after that, he failed to meet at least two standards.  (*See* Hudock 2011–2012 Performance Review 1, 4.)[3]

As to Vauls, Williams emphasized that, in addition to declining test scores at Garnett, the Board was concerned about her "reported unresponsiveness to parent concerns and her lack of cooperation with Washington College," a nearby school that "partners with [the Board] to provide student teaching placements and internship opportunities."  (*See* Williams Aff. ¶ 13.)  Soon after Vauls' contract was not renewed, a parent wrote Couch, explaining that Vauls had never responded to her complaints about her child's reportedly chaotic classroom at Garnett.  (*See* Mot. Dismiss Ex. 48, ECF No. 7-49.)  Apart from the deficiencies noted by Williams,

---

[2] Hudock's reviews for the 2009–2010 and 2010–2011 school years evaluated his performance under six separate standards.  (*See* Hudock 2009–2010 Performance Review; Hudock 2010–2011 Performance Review.)  The following school year's review included three additional standards, as well as a third grade for principals who "exceed[]" the standard.  (*See* Hudock 2011–2012 Performance Review.)  A table summarizing whether each of the Board's principals satisfied each of the applicable performance standards for the 2010–2011 and 2011–2012 school years suggests that at least one principal received such an "exceeds" standard grade during the 2010–2011 school year.  (*See* Mot. Dismiss Ex. 33, Comparative Principal Evaluation Summary, ECF No. 7-34.)  The form on which Wheeler recorded her evaluation of Hudock for that year, however, contains no indication that such a grade was available when Hudock was evaluated.  (*See* Hudock 2010–2011 Performance Review 5.)

[3] The Board appended to its motion a table summarizing whether each of the Board's principals satisfied each of the applicable performance standards for the 2010–2011 and 2011–2012 school years.  That summary indicates that Hudock failed to meet *three* of the nine standards evaluated that year—namely, standards one, four, and seven.  (*See* Comparative Principal Evaluation Summary.)  The copy of that year's review included in the record, however, omits one page of that document, on which Hudock's evaluation under standards six and seven appears to have been recorded.  (*See* Hudock 2011–2012 Performance Review.)  Nor is that review dated and signed by Hudock and Wheeler, unlike his reviews for the previous two school years.  (*Compare* Hudock 2011–2012 Performance Review 6, *with* Hudock 2010–2011 Performance Review 6, *and* Hudock 2009–2010 Performance Review 7.)

representatives of the Maryland Coalition for Inclusive Education observed Garnett's classrooms and provided constructive criticism on the basis of their observations, much as they had done at Worton.  (*See* Mot. Dismiss Ex. 49, ECF No. 7-50.)  In a phone call with the Board's administration, the Director of that organization described Vauls as "very willing to accept help," but complained that she failed to "follow through on suggestions to improve instruction in her building" and "was not clear about the priorities to be addressed," leading to slow progress. (Quirk Notes 1.)[4]  And Wheeler twice reminded Vauls that her records indicated Vauls had not adequately observed her teachers' classrooms during the 2011–2012 school year.  (*See* Mot. Dismiss Exs. 46, 47, ECF Nos. 7-47, 7-48.)  Consistent with those reminders, Vauls' performance review for that school year indicated that she had not met the standard for "purposeful observation and evaluation of teachers," as well as one other standard.  (*See* Mot. Dismiss Ex. 45, Vauls 2011–2012 Performance Review 4, 5, ECF No. 7-46.)  Notably, however, she exceeded expectations in two of the nine standards applicable in that year.  (*See id.* at 6, 7.) None of Vauls' other performance reviews are included in the record.

    In her affidavit, Wheeler again minimized many of these concerns as to both Hudock and Vauls.  "Parental complaints are not unusual," she explained, "and do not necessarily reflect negatively on a principal's job performance."  (Wheeler Aff. ¶ 25.)  As to the perceived behavioral problems that motivated those complaints, Wheeler emphasized substantial demographic changes at both schools.  In the 2011–2012 school year, the Board closed a middle school, redistricting its fifth grade students to several elementary schools.  (*See id.* at ¶ 17.) Worton and Garnett received the greatest number of these redistricted students, including many

---

[4] In that phone call, the Director also described the Coalition's poor working relationship with Hudock. And, as noted, *see supra* note 1, the memorandum describing that call is dated November 15, 2013—long after Vauls' contract was not renewed.  (*See id.*)

from what Wheeler described as "impoverished families." (*Id.* at ¶ 18.)  Worton, which had

previously schooled "primarily a Caucasian student body," absorbed "a significant composition

of African American and Title I students" as a consequence of the redistricting.  (Wheeler Aff. ¶

19; *see also* Hudock Aff. ¶ 5.)  The change "created some issues in the school culture," which

Wheeler believed Hudock handled "professionally and proactively," leading to a sharp decrease

in "parental concerns at" the school after the 2011–2012 school year.  (*Id.* at ¶ 20.)  In any case,

Wheeler added, she believed that parental concerns in that year "resulted more from the

demographic changes in the [Board's school] system than from any deficiencies in Mr. Hudock's

performance." (*Id.* at ¶ 21.)  Hudock agreed with that assessment, adding that Worton's

declining test scores were attributable to the school's new students.  (*See* Hudock Aff. ¶ 25.)  As

for the complaints the Director of the Maryland Coalition for Inclusive Education apparently

reported to Silver in fall 2013, Wheeler stated that no one from the Coalition brought any such

grievances to her attention during her tenure as superintendent.  (*See* Wheeler Aff. ¶ 48.)  Last,

Wheeler never asked the Supervisor of Human Resources to prepare a performance improvement

plan for Hudock or Vauls, the procedure typically employed by the Board to monitor the work of

employees whose performance is deemed unsatisfactory on initial review by a supervisor.  (*See*

Opp. Mot. Dismiss Ex. 5, Grafton Aff. ¶ 6, 7.)

On June 24, 2013, Silver visited Hudock in his office to inform him that his contract

would not be renewed for the coming school year.  (*See* Hudock Aff. ¶ 14.)  In his affidavit,

Hudock describes the encounter as follows:

> Mr. Silver offered me the option of resigning instead of being terminated, but
> offered no explanation and did not offer me any consideration or inducement for
> his [sic] resignation.  Mr. Silver told me that I had to make a choice then and there
> and that, if I did not resign, Mr. Silver was explicit that I would be terminated.  It

> was a stark, inflexible choice, either submit my "voluntary" resignation or be fired immediately.  He did not give me a chance to consider the choice or consult with an attorney.  I viewed it as a "take it or leave it" proposition, which really I considered to be no choice.

(*Id.*)  After speaking briefly with the Supervisor of Human Resources, Hudock composed and signed a resignation letter, dated June 24.  (*See* Hudock Aff. ¶¶ 14–15; *see also* Mot. Dismiss Ex. 15, ECF No. 7-16.)  Nonetheless, Silver signed and delivered a letter, dated the following day, indicating that Hudock's contract would not be renewed for the following term.  (*See* First Silver Aff. ¶ 9; Mot. Dismiss Ex. 14, ECF No. 7-15.)  Silver, for his part, recalls the incident differently.  In an affidavit, Silver states that Hudock, not he, "first broached the subject about the option of resigning" and that he "never pressured [Hudock] to resign" or asked Hudock "to make any immediate choices then and there."  (Reply to Opp. Mot. Dismiss Ex. 4, Second Silver Aff. ¶ 9, ECF No. 24-4.)

The day after meeting with Hudock, Silver visited Vauls to inform her that her contract would not be renewed for the coming school year.  (*See* First Vauls Aff. ¶ 11.)  That decision, Silver told her, was premised on Couch's opinion that Vauls "had been at Garnett long enough for scores to be better and that she was non-tenured."  (*Id.*)  In a subsequent conversation between Vauls and Williams, Williams explained that he had supported Couch's decision "because she had been hired to do what she needed to do."  (*Id.* at ¶ 12.)  Williams stated that he had not spoken to the Board's testing coordinator about the recent MSA scores before her non-renewal.  (*See id.*)  Another Board member with whom Vauls spoke, Brian Kirby, indicated that the decision not to renew Vauls' contract lay with Couch.  "I don't have a problem with you," he explained.  "The Board sets policy; does not handle personnel issues."  (*Id.* at ¶ 13.)  Indeed, in an email responding to Vauls' request to discuss her non-renewal, Couch refers to that decision

as her own, stating: "[M]y decision will have to remain until I arrive" in Kent County the

following week. (Opp. Mot. Dismiss, Ex. 12, Email from Couch to Vauls, ECF No. 18-13.)

Silver also signed and delivered to Vauls on June 27 a letter dated June 25, informing her that the

Board would not renew her contract for the coming school year. (*See id.* at ¶ 18; First Silver Aff.

¶ 9; Mot. Dismiss Ex. 41, ECF No. 7-42.)

Wheeler never authorized Hudock's or Vauls' non-renewal letters. She did not direct

Silver to sign and deliver them on her behalf. (*See* Wheeler Aff. ¶ 12, 39.) Nor did Wheeler

recommend that Hudock's and Vauls' contracts not be renewed because, as she put it, "I

considered them qualified and acceptable performers." (*Id.* at ¶ 38.) To the contrary, she

strongly disapproved of their terminations—in part because those actions "had been taken by

someone without my knowledge approval or consent," such that she considered them "a

subterfuge and illegal under state law." (*Id.* at ¶¶ 40, 41.) Wheeler expressed her sentiments via

email and text message to Williams and Silver. (*See id.* at ¶ 41.) Williams responded that, on

the basis of advice he had received from counsel, Wheeler's successor, Couch, possessed the

authority to terminate Hudock and Vauls before Couch's term had begun. (*See id.* at ¶ 47.)

After Hudock's termination, Gina Jachimowicz assumed his duties at Worton. (*See*

Hudock Aff. ¶ 19.) Jachimowicz is roughly two years older than Hudock and preceded him as

principal of Worton, before she was appointed the Board's Supervisor of Language Arts. (*See*

Mot. Dismiss Exs. 34–36, ECF Nos. ECF No. 7-35, 7-36, 7-37.) At some later date, not clear in

the record, Jachimowicz became Supervisor of Elementary Education. (*See* Mot. Dismiss Ex.

39, Jachimowicz Performance Review 1, ECF No. 7-40.) The factual summary included in the

Board's dispositive motion asserts that Jachimowicz performed adequately upon replacing

Hudock, and her contract was renewed.  (*See* Mem. Supp. Mot. Dismiss 13, ECF No. 7-1.)  The

document on which that summary relies—a performance review completed in summer 2014—

indicates that Jachimowicz's formal position title remained Supervisor of Elementary Education,

a position she continued to fill while also "stepping up to oversee the principalship at Worton

Elementary." (Jachimowicz Performance Review 1.)  That document does not suggest that her

job duties for the following year included continuing responsibility for Worton.  Indeed,

Hudock's affidavit states that Jachimowicz served as principal for only "*part* of the 2013–2014

school year," before being replaced in that role by Tina Washburn, a substantially younger

administrator.  (Hudock Aff. ¶ 19 (emphasis added).)  As for Vauls, she was replaced at Garnett

by Stacy Clark, a substantially younger white woman.  (*See* First Vauls Aff. ¶ 20.)

At a public meeting of the Board on July 15, 2013, Sarah Brown, a former member of the

Board, asked who had made the decision not to renew Hudock's and Vauls' contracts.  (*See* Opp.

Mot. Dismiss Ex. 12, Brown Aff. ¶ 9, ECF No. 18-14; Mot. Dismiss Ex. 17, 7/15/13 Meeting

Minutes 3, ECF No. 7-18.)  That question was referred to legal counsel present at the meeting,

who responded that the decision was made under the authority of Wheeler's administration.  (*See*

Brown Aff. ¶¶ 10, 12; 7/15/13 Meeting Minutes 3–4.)  When specifically asked whether Wheeler

herself had made that decision, counsel refused to provide additional details.  (*See* Brown Aff. ¶¶

13–14; 7/15/13 Meeting Minutes 4.)

## ANALYSIS

### I. Standard of Review

The Board has moved to dismiss Hudock's and Vauls' complaint for failure to state a

claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary

judgment under Federal Rule of Civil Procedure 56.  A court considers only the pleadings when deciding a Rule 12(b)(6) motion.  Where, as here, the parties present materials outside of the pleadings and the court considers those materials the motion is treated as one for summary judgment under Federal Rule of Civil Procedure 12(d).  "There are two requirements for a proper Rule 12(d) conversion." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (en banc).  First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which may be satisfied when a party is "aware that material outside the pleadings is before the court." *Id.* (quoting *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir. 1985)).  "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Id.* (quoting *Gay*, 761 F.2d at 177).

Here, the plaintiffs had adequate notice that the Board's motion might be treated as one for summary judgment.  The motion's alternative caption and attached materials in themselves put Hudock and Vauls on notice. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).  Moreover, the plaintiffs referred to the motion in their opposition brief as one for summary judgment and submitted additional exhibits.  The plaintiffs assert, however, that they have not been granted reasonable opportunities to discover evidence in the Board's exclusive control.  Indeed, they have filed a motion and supporting affidavit under Rule 56(d), seeking further discovery relevant to several of their claims. *See* Fed. R. Civ. P. 56(d); *see also Greater Balt.*, 721 F.3d at 281 (explaining that the party opposing Rule 12(d) conversion "took 'the proper course' when it filed the Rule 56([d]) Affidavit, 'stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery'" (citation omitted)).

"Notably, Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery. Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be essential to [the] opposition." *Hart v. Lew*, 973 F. Supp. 2d 561, 573 (D. Md. 2013) (alteration in original) (internal citations and quotation marks omitted).  Whether the plaintiffs have satisfied that standard as to particular issues is considered below, as relevant.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added).  Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48.  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Greater Balt.*, 721 F.3d at 283.  At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## II. Sovereign Immunity

The Board first argues, and the plaintiffs concede, that their damages under the ADEA,

the Maryland Declaration of Rights, and Section 1981 are capped at $100,000 by Maryland's

limited waiver of its sovereign immunity.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-518(b); (*see*

*also* Mot. Dismiss 19–22; Opp. Mot. Dismiss 28).  Accordingly, the plaintiffs' damages for those

claims will be limited to $100,000.

### III. Title VII Damages

The Board asserts that its damages under Title VII are capped at $200,000 on the ground

that it employs between 200 and 500 individuals.  *See* 42 U.S.C. § 1981a(b)(3)(C).  In its initial

memorandum in support of its motion, the Board did not support that claim with evidence as to

the number of people it employed in the period before the plaintiffs' termination.  To its reply,

however, the Board appends a copy of its budget for the 2014 fiscal year, along with an affidavit

from Silver stating, on the basis of that budget, that the Board employed less than 501 people.

(*See* Second Silver Aff. ¶ 2; Reply to Opp. Mot. Dismiss Ex. 1, 2014 Fiscal Year Budget, ECF

No. 24-1.)

Even if that evidence had been incorporated into the record in a timely fashion, it would

not support the Board's argument.  First, the 2014 budget does not record the number of Board

employees during the relevant time period.  The statute the Board invokes, 42 U.S.C.

§ 1981a(b)(3)(C), caps a Title VII defendant's damages according to the number of people it

employs "in each of 20 or more calendar weeks in the current or preceding calendar year."  That

period "refers to the year of the [alleged] Title VII violation . . . ."  *Depaoli v. Vacation Sales*

*Assocs., LLC*, 489 F.3d 615, 622 (4th Cir. 2007).  Neither the budget nor anything else in the

record explains how the Board defines its fiscal year.  As to its temporal scope, the budget

contains in the margin of most pages the date "6/14/2013," perhaps indicating that the document

was drafted or adopted on that day.  Given that Hudock and Vauls were terminated only weeks later, that budget does not constitute evidence of the number of employees maintained by the Board in 20 or more weeks of the preceding calendar year.  Silver's reliance on it is thus misplaced.

Even were it otherwise, that budget does not refer to the *number* of employees on the Board's payroll.  Instead, it contains a column marked "FTE," presumably in reference to "full-time equivalents."  That phrase typically refers to "[a] unit of measurement equal to one employee working a full-time job over a specified time period, used to determine statistics such as . . . expenses per full-time employee, when the employment pool consists of both part-time and full-time employees." *American Heritage Dictionary* 709 (5th ed. 2011).  The court cannot rely on the number of full-time equivalents in this context because Title VII's damages cap appears to include part-time workers in its count of employees.  *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207, 210 (1997) (holding that nearly identical language in 42 U.S.C. § 2000e(b) includes part-time employees); *see also IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning.").  "[T]he ultimate touchstone" of the required analysis is the number of individuals with whom the Board "ha[d] employment relationships" in the relevant time period. *Walters*, 519 U.S. at 212.  The number of "full-time equivalents" does not necessarily answer that question.

Accordingly, the court will not cap the plaintiffs' damages at $200,000 under 42 U.S.C. § 1981a(b)(3)(C) at this time.

**IV. Discrimination Claims**

Under a host of state and federal statutes, Hudock and Vauls both allege the Board

terminated them on the basis of their age.  They each supplement that claim with another

allegation of discrimination: Hudock asserts discrimination on the basis of gender, Vauls on the

basis of race.[5]  "Generally speaking, a plaintiff may avert summary judgment and establish a

claim for intentional . . . discrimination through two avenues of proof."  *Hill v. Lockheed Martin*

*Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc).

> A plaintiff can . . . present[] direct or circumstantial evidence that raises a genuine
> issue of material fact as to whether an impermissible factor such as race motivated
> the employer's adverse employment action. . . . Alternatively, a plaintiff may
> "proceed under [the *McDonnell Douglas*] 'pretext' framework, under which the
> employee, after establishing a prima facie case of discrimination, demonstrates
> that the employer's proffered permissible reason for taking an adverse
> employment action is actually a pretext for discrimination."

*Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (alteration in

original) (quoting *Hill*, 354 F.3d at 285).  The plaintiffs at this time offer no direct evidence of

discrimination, so their claims must be analyzed via the pretext framework.  Under that

framework, the Board challenges the plaintiffs' capacity to prove their job performance was

satisfactory, which is both an element of the prima facie case for all their discrimination claims

---

[5] Hudock and Vauls allege age discrimination in violation of the ADEA, 29 U.S.C. §  623(a)(1), and FEPA, Md. Code Ann., State Gov't § 20-606(a)(1)(i).  Hudock, but seemingly not Vauls, also alleges violation of Md. Code Ann., Educ. § 6-104(b) on the basis of age.  Hudock and Vauls raise their respective claims of gender and race discrimination under 42 U.S.C. § 1981(a), Title VII, 42 U.S.C. § 2000e-2(a)(1), Title VI, 42 U.S.C. § 2000d, FEPA, Md. Code Ann., State Gov't § 20-606(a)(1)(i), Articles 24 and 46 of the Maryland Declaration of Rights, and Md. Code Ann., Educ. § 6-104(b).  The Board argues all of these statutes, both federal and state, authorize proof via the *McDonnell Douglas* burden shifting framework, which Hudock and Vauls do not dispute.  *See, e.g.*, *Hall v. Greystar Mgmt. Servs., L.P.*, 28 F. Supp. 3d 490, 498 (D. Md. 2014) ("Maryland courts routinely look to federal anti-discrimination statutes, particularly Title VII, in determining the scope of liability under Title 20."); *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 495 (D. Md. 2013) ("Courts judge section 1981 racial discrimination claims under the same standards as Title VII."); *Middlebrooks v. Univ. of Md. at Coll. Park*, 980 F. Supp. 824, 831 (D. Md. 1997) ("[C]ourts commonly use the Title VII proof scheme to evaluate claims under Title VI and § 1981."); *Penhollow v. Bd. of Comm'rs for Cecil Cnty.*, 695 A.2d 1268, 1287 (Md. Ct. Spec. App. 1997) (applying the same standard to claims under Title VII and Article 46).

and relevant to their ability to prove pretext.  And the Board challenges Hudock's ability to prove an element of his prima facie case of age discrimination, as well as the applicability of Title VI, one of several federal statutes on which Vauls premises her claim of racial discrimination.

### A.  Satisfactory Performance

The Board argues Hudock and Vauls cannot prove their performance was satisfactory, which is an essential element in their prima facie case for each claim.[6]  Even were it otherwise, the Board continues, the plaintiffs cannot prove the Board's proffered non-discriminatory justification for their terminations—unsatisfactory performance—is pretextual.  Evidence of an employee's allegedly poor performance may be used "at different stages of the *McDonnell Douglas* framework."  *Warch*, 435 F.3d at 516.  At the prima facie stage, "the plaintiff is free to demonstrate that the employer's qualifications or expectation are not, in fact 'legitimate,'" perhaps by showing that those "expectation were a 'sham designed to hide the employer's discriminatory purpose.'"  *Id.* at 517, 518 (quoting *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002)).  That, of course, is precisely a plaintiff's burden at the pretext stage, too, such that "the prima facie case is subsumed into one of establishing pretext under *McDonnell Douglas*'s third prong."  *Brummett*, 284 F.3d at 745.

---

[6] "Generally speaking, to establish a prima facie case of unlawful age discrimination, [a plaintiff] must show that (1) he is a member of the protected class; (2) he was qualified for the job and met [the employer's] legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger individual with comparable qualifications."  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006).  To make out a prima facie case of gender or race discrimination, a plaintiff must prove "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."  *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).  Generally, to establish this fourth element of the prima facie case of discriminatory termination, "Title VII plaintiffs must show that they were replaced by someone outside their protected class . . . ."  *Miles v. Dell*, 429 F.3d 480, 486 (4th Cir. 2005).  The Fourth Circuit, however, has "recognized that 'there may be exceptions to this rule in limited situations.'"  *Id.* (quoting *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998)).

Here, the record reveals that summary judgment on this ground is premature before Hudock and Vauls have been given an opportunity to engage in formal discovery.  Indeed, even on this undeveloped record, circumstances surrounding the Board's decision not to renew the plaintiffs' contracts suggest that its explanation of that choice is pretextual.

### i. The Board's Proffered Explanation

To explain its conduct, the Board primarily relies on the poor performance of Worton and Garnett students on the 2012–2013 MSA.  In addition, it highlights Hudock's and Vauls' alleged inattention to parental concerns and their purportedly poor annual performance reviews.

As to the test scores, factual questions remain as to whether the Board relied on them, as it claims.  As Wheeler and Hudock indicate, the 2012–2013 school year had been designated a "no fault" year for the purpose of testing a novel evaluation system for teachers and principals, such that school testing data would not be used for the purpose of evaluating principals.  (*See* Wheeler Aff. ¶ 29; Hudock Aff. ¶ 8; *see also* Opp. Mot. Dismiss, Ex. 4, ECF No. 18-5.) Moreover, a state statute prohibits the use of a single metric to evaluate a principal's performance, which calls into question the school system's heavy reliance on test scores at Worton and Garnett.  *See* Md. Code Ann., Educ. § 6-202(c)(5)(ii).  Violation of an employer's internal policies may be probative of pretext.  *See Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 399 (D. Md. 2009).  Even if such violations "must be material and significant" to constitute evidence of pretext—as an unpublished decision of this court suggests, *Parris v. Bd. of Educ. of Balt. Cnty.*, Civ. No. L-09-704, 2011 WL 3320326, at *4 (D. Md. July 25, 2011)—the Board's reliance on a proscribed standard of performance clears that hurdle.

Nor does the undeveloped record demonstrate that the test scores had been fully analyzed

at the time Hudock's and Vauls' contracts were not renewed.  There is no dispute that the raw

data were available—and that students at Worton and Garnett had performed poorly.  (*See*

Wheeler Aff. ¶ 33; Second Silver Aff. ¶¶ 5–7; First Vauls Aff. ¶ 9.)  But Hudock and Vauls both

dispute the availability of SPI scores, (*see* First Vauls Aff. ¶ 9; Hudock Aff. ¶ 26), which are the

primary basis for classifying schools in Strands 1 through 5, (*see* Academic Achievement

Summary 1).  Although Silver highlights the availability in early June 2013 of what he describes

as "the complex raw data of the MSA results," he does *not* state in his affidavit that he used that

data to calculate precise SPI scores, either for Worton and Garnett or for the other schools under

the Board's supervision, until the fall of that year.  (*See* Second Silver Aff. ¶¶ 5–7.)  And it is

Worton's and Garnett's classification as "Strand 5" schools on the basis of their SPI scores that

rendered their principals terminable under the Board's Master Plan and served as the basis for

comparing them to principals administering the Board's other schools.  (*See* First Silver Aff. ¶

14; Master Plan 2.)  On the present record, then, Hudock and Vauls have demonstrated

sufficiently that the Board's purported reliance on testing data from the 2012–2013 school year

may be "unworthy of credence."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256

(1981).[7]

 As to the Board's remaining explanations for its decision, Hudock and Vauls have not

had an opportunity to discover the sort of comparative evidence that might establish the

pretextual nature of those explanations.  The Board indicates that Hudock failed to respond

---

[7] The same reasoning precludes summary judgment on Hudock's gender discrimination claim or Vauls' race discrimination claims on the ground that neither can prove they were treated differently than other similarly situated principals, an element of their prima facie case. *See, e.g.*, *Coleman*, 626 F.3d at 190.  The Board asserts that Hudock was not similarly situated to other principals because Worton "was one of KCPS' lowest performing schools." (Mot. Dismiss 33.)  Presumably it objects to Vauls' prima facie case on the same ground, although the precise nature of its argument is somewhat unclear.  (*See id.* at 39.)  Those parallel arguments are premised on Worton's and Garnett's test scores.  As noted, the Board's reliance on this single metric of performance, together with other circumstances described below, supports an inference of pretext.

appropriately to parental concerns at Worton during the 2011–2012 school year, and it highlights his purportedly poor performance reviews, which contained some negative feedback.  Vauls, for her part, was also allegedly unresponsive to parents and sometimes failed to supervise her school adequately, a complaint consistent with the constructive criticism included in Vauls' annual performance review.[8]  As Hudock and Vauls correctly argue, the Board's proffered explanations cannot be evaluated without affording them access to the performance reviews of other administrators at the Board's schools, as well as documents regarding parental complaints and other observations at those schools.[9]

The need for such discovery is particularly acute insofar as Wheeler—Hudock's and Vauls' supervisor—did not share the Board's concerns with their performance.  To the contrary, she considered both employees to be "satisfactory performers.  While both principals, *like all my direct reports*, had issues that needed to be improved upon, their performance came nowhere near being unsatisfactory . . . ."  (Wheeler Aff. ¶ 27 (emphasis added).)  "Parental complaints are not unusual," she added.  (Wheeler Aff. ¶ 25.)  Wheeler's observations that "all" her employees received constructive criticism in her evaluation of them and that parental complaints were ubiquitous confirm the conclusion that summary judgment on the basis of parental complaints, the annual performance reviews, and other alleged inadequacies is premature before discovery.

---

[8] To the extent the Board relies on the negative observations of the director of the Maryland Coalition for Inclusive Education, the record suggests that those negative observations were not conveyed to the Board until mid-November 2013, long after the Board decided not to renew Hudock's and Vauls' contracts.  (*See* Quirk Notes 1; First Silver Aff. ¶ 17.)  It thus could not have motivated that decision.  For the same reason, the Board's reliance on a letter from a dissatisfied parent at Garnett, which postdates Vauls' termination, could not have provided any basis for her non-renewal.  (*See* Mot. Dismiss, Ex. 48, ECF No. 7-49.)

[9] The Board appends to its motion a table summarizing whether each of its principals satisfied each of the applicable performance standards for the 2010–2011 and 2011–2012 school years.  That table, however, is incomplete and cannot be verified even on the basis of the materials the Board has submitted in support of its motion.  *See supra* note 3.  It is no substitute for the sort of discovery Hudock and Vauls have requested.

## ii. Circumstances Probative of Pretext

Other circumstances surrounding Hudock's and Vauls' terminations call the Board's explanation of its decision into question.  First, the decision not to renew either employee's contract may have been unlawful, because those actions had not been recommended by the Board's superintendent.  Under Maryland law, a county board of education may dismiss a principal for certain enumerated failings "[o]n the recommendation of the county superintendent."  Md. Code Ann., Educ. § 6-202(a)(1).  According to Wheeler, she remained superintendent at the time of Hudock's and Vauls' termination and never recommended that action.  (*See* Wheeler Aff. ¶¶ 8, 38, 44.)  To the contrary, she strongly disapproved of their terminations.  (*See id.* at ¶¶ 40, 41.)  As noted, violation of applicable policies is probative of pretext, *Blasic*, 673 F. Supp. 2d at 399, especially because Hudock and Vauls would not have been terminated at that time but for the Board's disregard for Wheeler's opinion.

Moreover, the Board appears to have misrepresented the basis for its action in the immediate aftermath of the decision not to renew Hudock's and Vauls' contracts.  When asked who had made that decision at a public meeting, the Board referred the question to counsel, who stated that the decision was made under Wheeler's authority.  (Brown Aff. ¶¶ 10, 12; 7/15/13 Meeting Minutes 3–4.)  Wheeler, however, denies approving any such action.  And the record proffered by the Board now suggests that the Board approved not her decision but the recommendation of the incoming superintendent, Couch, to dismiss Vauls and, presumably, Hudock, even though Couch had not yet assumed her office.  Unless it can better explain itself on a more fully developed record, the Board's inconsistent explanation for the source of its decision to terminate Hudock and Vauls is probative of pretext.  *See, e.g.*, *Dennis v. Columbia*

*Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002).

Silver's strangely elliptical description of his analysis of the testing data confirms the potentially shifting character of the Board's explanation for its decision.  As noted, Silver concluded, on the basis of his evaluation of test scores in fall 2013, that "[t]he removal of the principals at [Worton] and [Garnett] *could be justified* by reviewing the student achievement data and looking at the lack of progress in moving these schools forward."  (First Silver Aff. ¶ 14 (alterations in original) (emphasis added) (quoting Academic Achievement Summary 2).) Silver's use of the phrase *could be* suggests a tentative possibility rather than a description of the actual basis for the Board's decision.  That inference is further reinforced by Silver's comment to Vauls, after briefing on the Board's motion to dismiss was complete, "that he was not in favor of some of the comments he had been asked to make during this litigation," and that his effort "to make truthful statements" had been rebuffed.  (Mot. Supplement Ex. A, Second Vauls Aff. ¶¶ 7– 8, ECF No. 28-2.)[10]

In the face of this evidence, the Board asserts the "strong inference" against discrimination "when the plaintiff already was within the scope of the ADEA when she was hired," *Kess v. Mun. Emps. Credit Union of Balt., Inc.*, 319 F. Supp. 2d 637, 649 (D. Md. 2004), which is true of both Hudock and Vauls.  But such an inference should be drawn "[o]nly where the same individual—not company—took both positive and negative employment actions within a short period of time and with knowledge of the plaintiff's membership in a protected class."

---

[10] Soon after Silver made those comments, Vauls moved to supplement the record with an additional affidavit describing her conversation with Silver.  (*See* Mot. Supplement , ECF No. 28-1.)  She argues that supplementation would not prejudice the Board and would improve the court's fact finding.  *See Prowess, Inc. v. Ray Search Labs., AB*, 953 F. Supp. 2d 638, 655 (D. Md. 2013).  The court will grant that motion where, as here, Silver's comments, which cut to the heart of the Board's proffered explanation of its conduct, postdate the completion of briefing and the parties have not yet initiated formal discovery.

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 782 (D. Md. 2010).  Neither of those necessary conditions is satisfied here.  Both Hudock and Vauls had been hired as principals years before their terminations: Hudock had served as principal of Worton since the 2007–2008 school year.  (*See* Hudock Aff. ¶ 4.)  Vauls began administering Garnett the following school year.  (First Vauls Aff. ¶ 5.)  And the decision not to renew their contracts appears to have been recommended by incoming superintendent Couch, who had nothing to do with the initial decision to hire either administrator.  The court thus cannot draw the inference the Board asserts.

On the present record, then, Hudock and Vauls offer evidence sufficient for a jury to infer that the Board's explanation for not renewing their contracts is pretextual.

### B. Hudock's Age Discrimination Claim

Apart from Hudock's allegedly unsatisfactory performance, the Board argues Hudock cannot make out the fourth element of his prima facie case of age discrimination—namely, that "following his discharge, he was replaced by a substantially younger individual with comparable qualifications."  *Warch*, 435 F.3d at 513.[11]  After Hudock's contract was not renewed, Jachimowicz, who is somewhat older than Hudock, assumed responsibility for his former position.  Characterizing Jachimowicz as Hudock's replacement, the Board asserts that Hudock's prima facie case fails as a matter of law.

Jachimowicz's brief tenure at Worton precludes the Board's argument, at least on the present record.  During the time she assumed Hudock's former duties, her formal title remained Supervisor of Elementary Education, and she continued to fill that role while also administering Worton.  (*See* Jachimowicz Performance Review 1.)  "A 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties . . . . A person is

---

[11] The Board does not advance this argument against Hudock's gender discrimination claim.

replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'" *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).  Here, after what Hudock describes as only "part of the 2013–2014 school year," the Board hired a substantially younger administrator to take the helm at Worton full time, relieving Jachimowicz of those additional responsibilities she had briefly assumed.  (Hudock Aff. ¶ 17.)  Hudock has thus satisfied this element of his prima facie case.

### C. Vauls' Race Discrimination Claim Under Title VI

Vauls alleges that her termination violated Title VI, which prohibits racial discrimination "under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To "ensure[] that Title VI is not transformed into an avenue for pursuing all employment discrimination claims," *Rogers v. Bd. of Educ. of Prince George's Cnty.*, 859 F. Supp. 2d 742, 747 (D. Md. 2012), its prohibition applies only "where a primary objective of the Federal financial assistance is to provide employment," 42 U.S.C. § 2000d-3.  To satisfy that limitation, "a plaintiff must show either (1) that a primary objective of the federal funding defendant receives is to provide employment, or (2) that the employment discrimination complained of necessarily causes discrimination against the intended beneficiaries of the federal funding." *Rogers*, 859 F. Supp. 2d at 750.  Any such funding "must be received during the relevant time period of the alleged discrimination for a cause of action to survive."  *Johnson v. Bd. of Educ. of Prince George's Cnty.*, Civil No. PJM-11-1195, 2014 WL 3778603, at *1 (D. Md. July 29, 2014).[12]

In her complaint, Vauls asserts that "[a]t all times relevant to this Complaint" the Board

---

[12] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

received federal funds "the primary objective of which is to provide employment," including,

"but not limited to, funds . . . distributed pursuant to the American Recovery and Reinvestment

Act of 2009 ('ARRA')."  (Compl. ¶¶ 133–134.)  The Board retorts that it received no such funds

at the time of Vauls' termination.  For support, it appends to its reply memorandum an affidavit

and budget indicating that an Education Jobs Grant funded by the ARRA had been exhausted by

September 30, 2012, and had not been renewed during the 2012 fiscal year.  (Reply Mot.

Dismiss Ex. 3, Councell Aff. ¶¶ 6–7, ECF No. 24-3; Councell Aff. Ex. A, 2014 Budget 16, ECF

No. 24-3; Councell Aff. Ex. B, Grant Master Data Worksheet, ECF No. 24-3.)

　　　In a surreply, Vauls notes that the Board continued to receive federal funding from other

sources at the time of her termination, as its budget demonstrates.  (*See* 2014 Budget 16.)[13]  She

contends that she is entitled to discovery concerning the purposes of that funding, among other

things, under Federal Rule of Civil Procedure 56(d).  (*See* Rule 56(d) Mot. 4, ECF No. 16.)  Such

"a request [for discovery] is 'broadly favored and should be liberally granted because the rule is

designed to safeguard non-moving parties from summary judgment motions that they cannot

adequately oppose.'"  *Greater Balt.*, 721 F.3d at 281 (quoting *Raby v. Livingston*, 600 F.3d 552,

561 (5th Cir. 2010)).  The Board nevertheless seeks summary judgment on the ground that "the

additional evidence sought for discovery would not have by itself created a genuine issue of

material fact sufficient to defeat summary judgment."  *Ingle ex rel. Ingle v. Yelton*, 439 F.3d 191,

---

[13] Vauls moves for leave to file a surreply on the ground that the Board's reply raises factual matters not presented in its initial motion.  (*See* Mot. Leave File Surreply 2, ECF No. 26.)  The Board responds that a surreply is inappropriate insofar as the evidence it appended to its reply "merely respon[ds] to new arguments made by [Vauls] in [her] response."  *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013) (quoting *Aguilar v. LR Coin Laundromat*, Civil No. RDB-11-2352, 2012 WL 1569552, at *3 (D. Md. May 2, 2012)).  The factual premise of that argument is inaccurate.  The Board's initial motion focused on the alleged inadequacy of Vauls' *complaint*, arguing that she "failed to specifically allege any temporal relationship" between the receipt of federal funding and any alleged discrimination.  (Mot. Dismiss 24.)  In their reply, however, the Board shifts from the face of the complaint to evidence appended to its memorandum, arguing that it is entitled to summary judgment.  (*See* Reply 3.)  Accordingly, Vauls' motion for leave to file a surreply will be granted.  *See, e.g.*, *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003).

195 (4th Cir. 2006) (quoting *Strag v. Bd. of Trustees*, 55 F.3d 943, 954 (4th Cir. 1995)).  Here,

however, discovery may well reveal that one of the many federal grants listed in the Board's

budget were for the purpose of securing employment, as Vauls alleges.  For this reason,

summary judgment on Vauls' Title VI claim will be denied.

**V. Hudock's Procedural Due Process Claim**

Hudock asserts violation of his right to due process, arguing the Board's decision not to

renew his contract deprived him of a property interest in his former job without informing him of

his statutory right to a hearing, much less offering him such a hearing.  (*See* Compl. Count VII.)

"Article 24 and the Fourteenth Amendment of the U.S. Constitution are construed as parallel

with each other."  *Robles v. Prince George's Cnty., Md.*, 302 F.3d 262, 272 (4th Cir. 2002)

(citing *Williams v. Prince George's Cnty.*, 685 A.2d 884, 895 (1996)).  The Board does not

contest Hudock's asserted property interest in his job or its failure to offer him a hearing.

Instead, it argues that Hudock's resignation precludes his claim.

"If [an employee] resigned of his own free will even though prompted to do so by events

set in motion by his employer, he relinquished his property interest voluntarily and thus cannot

establish that the state 'deprived' him of it within the meaning of the due process clause."  *Stone

v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988).  By contrast, a resignation

"so involuntary that it amounted to a constructive discharge" constitutes a deprivation,

preserving whatever procedural protections a discharged employee would otherwise possess.  *Id.*

A resignation "forced by the employer's duress or coercion" is involuntary.  *Id.* at 174.  To

evaluate the allegedly coercive character of an employer's conduct, courts assess via an objective

standard "the totality of circumstances" surrounding an employee's resignation, paying special

28

attention to "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." *Id.*

Evaluating the record in the light most favorable to Hudock, as Rule 56 requires, reveals that his resignation was coerced, not voluntary. According to Hudock, when Silver entered his office to inform him that he could either resign or not have his contract renewed, Silver stated that Hudock "had to make a choice then and there." (Hudock Aff. ¶ 14.) Failure to resign immediately, Silver continued, would lead to Hudock's termination. (*Id.*) Where, as here, an employee is asked to choose between "immediate resignation or immediate termination," he is faced with "no genuine choice or alternative at all; it is rather a variant of the proverbial Hobson's choice where the so-called 'choice' is wholly illusory and is in fact no choice at all." *Bauer v. Holder*, 25 F. Supp. 3d 842, 852–53 (E.D. Va. 2014). As to Hudock's understanding of his choice, he was an experienced educational administrator, but was not given adequate time in which to consult counsel as to his legal entitlements. *Compare Stone*, 55 F.2d at 177 (explaining that a sophisticated, experienced doctor knew of his rights in light of his life experience, "and if he did not, he was given ample time to find out" by consulting an attorney). Although Hudock contacted the Board's Human Resources administrator before making his choice, Silver demanded his decision "then and there." (Hudock Aff. ¶ 14.) And Silver granted Hudock no opportunity to negotiate terms; whether he resigned or not, his final day on the job would be June 30.

The Board disputes those facts, relying on Silver's contrary account of events. The

Board asserts, for example, that Hudock had at least the six days between June 24, when Silver

visited Hudock in his office, and June 30, his final day of work, to evaluate his options.  But that

inference requires the court to disregard Hudock's contrary statement that Silver required

Hudock to make his choice immediately.  A jury might well credit Silver rather than Hudock.

But such "[c]redibility determinations . . . are jury functions, not those of a judge " resolving a

motion for summary judgment.  *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310

(4th Cir. 2014) (alteration in original) (quoting *Anderson*, 477 U.S. at 255).

The Board next argues that Hudock was put to no Hobson's choice.  Invoking *Stone*, the

Board emphasizes that "the mere fact that the choice is between comparably unpleasant

alternatives—e.g., resignation or facing disciplinary charges—does not of itself establish that a

resignation was induced by duress or coercion, hence was involuntary.  This is so even where the

only alternative to resignation is facing possible termination for cause . . . ."  855 F.2d at 174

(internal citation omitted).  Hudock, however, was not given the option of "facing disciplinary

charges" or "*possible* termination."  *Id.* (emphasis added).  Instead, he was forced to decide

between resignation and *immediate* termination, with no mention (then or later) of any

disciplinary process.

Accordingly, the Board's motion for summary judgment on Hudock's procedural due

process claim will be denied.

## VI. Wrongful Termination

Hudock and Vauls allege they were wrongfully terminated in violation of Md. Code

Ann., Educ. § 6-202.  That provision governs discipline of school principals and other public

school employees.  Among other things, it conditions removal of a principal on written notice of

the charges against her and an opportunity to request a hearing.  *See* Md. Code Ann., Educ. § 6-202(a)(2).  It also mandates the adoption of regulations to govern performance evaluations, including a prohibition on using any "single criterion . . . for more than 35% of the total performance evaluation criteria."  Md. Code Ann., Educ. § 6-202(c)(5)(ii); *see also* Md. Code Ann., Educ. § 6-202(c)(2)(i).  Hudock and Vauls premise their claim on the failure to provide any process to contest their removals and the Board's disproportionate reliance on their recent MSA results.

As to Hudock, the Board argues that his resignation renders those statutory protections inapplicable.  As noted, however, material questions of fact remain as to the voluntariness of that resignation, which may have amounted to a constructive discharge.  *See supra* Part V.  Summary judgment on his claim is thus inappropriate.

As to Vauls, the Board asserts that her status as a rehired retired administrator precludes her from accessing the protections codified at Md. Code Ann., Educ. § 6-202.  For support, it invokes a regulation authorizing local boards of education to terminate such an employee for unsatisfactory performance of the duties set out in the contract of employment.  *See* Md. Code Regs. 13A.07.02.05(E).  That regulation is silent, however, as to the applicable standard of evaluating the performance of those contractual duties.  It thus offers no reason to believe that the evaluative criteria required by Md. Code Ann., Educ. § 6-202(c)—which are not expressly limited to employees who have never retired but expressly preclude reliance on any single criterion for more than 35% of a principal's evaluation—should not apply.  The Board does not argue that Vauls' contract expressly supplanted the statutory standard for evaluation.  Nor does it explain why the regulation it invokes is the exclusive source of protection for rehired retired

employees, as its argument implies.

Even if those evaluative criteria did not apply to rehired retired employees, the regulation on which the Board relies seems to incorporate by reference an opportunity to be heard.  For rehired retired employees, that regulation requires "[a] controversy or dispute arising out of or relating to a contract or breach of contract [to] be governed by the procedures set forth in Education Article § 4-205(c)."  Md. Code Regs. 13A.07.02.05(F).  That statute, in turn, empowers superintendents, not the local board of education, to decide in the first instance certain "controversies and disputes."  Md. Code Ann., Educ. § 4-205(c)(2).  Such decisions are, among other procedural protections, "[s]ubject to the provisions of § 6-203 . . . of this article," *id.*, which authorizes county boards to appoint examiners to conduct disciplinary hearings and governs some of the procedures at such hearings.  Of greater significance, the statute provides for appeal from a superintendent's determinations, first to the county board and later to the state board.  *See* Md. Code Ann., Educ. § 4-205(c)(3).  Taken together, those provisions seem to imply at least the right to notice and some opportunity to be heard, as well as a right to a preliminary determination by the sitting superintendent.  But this court need not decide if such a right to notice and some opportunity to be heard are implied by the statute, because they are also the minimum requirements of the due process clause.  *See, e.g.*, *Snider Int'l v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014).

Although Vauls' complaint premises her claim only on Md. Code Ann., Educ. § 6-202, that complaint also clarifies that she alleges deprivation of a hearing and opportunity to respond, as well as disproportionate reliance on a single criterion of evaluation.  Her failure to cite the regulation invoked by the Board is immaterial where, as here, it appears to provide for similar

procedural protections in Section 6-202 and does not supplant the evaluative criteria mandated

by that statute.  *See, e.g.*, *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 418 (4th Cir.

2014) (reversing dismissal of a complaint that failed to use the phrase "bystander liability" on the

ground that plaintiffs are "not required to use any precise or magical words in their pleading").[14]

## VII. Motion to Sever

The Board also moves to sever Hudock's claims from those of Vauls, arguing that

consolidated proceedings risk confusing the jury and prejudicing the Board.  "A district court has

broad discretion in deciding whether to grant severance."  *Equal Rights Ctr. v. Equity*

*Residential*, 483 F. Supp. 2d 482, 489 (D. Md. 2007).  That discretion is guided by "a

presumption in favor of the nonmoving party that all claims in a case will be resolved in a single

trial and not be severed, placing the burden on the party moving for severance to show that (1) it

will be severely prejudiced without a separate trial; and (2) the issue to be severed is so 'distinct

and separable' from the others that a trial of that issue alone may proceed without injustice."  *Id.*

(citing *Jeanty v. Cnty. of Orange*, 379 F. Supp. 2d 533, 548–49 (S.D.N.Y. 2005)).[15]

The Board has not carried its burden here.  Hudock and Vauls premise their claims on a

common set of facts.  Although Hudock's and Vauls' remaining gender and racial discrimination

claims arise under different causes of action, the legal standards applicable to each are similar

and involve resolution of several identical questions, including the allegedly pretextual character

of the Board's reliance on testing data and the lawfulness of its seemingly simultaneous decision

to terminate both principals without Wheeler's recommendation and without process.  Separating

---

[14] The court notes the parties did not focus extensively on this question in their papers.  Further briefing on the applicable law may persuade the court to endorse a different conclusion.  On the basis of the parties' presentations thus far, however, Vauls has stated a claim for wrongful termination.

[15] Although *Equal Rights Center* considered a motion to sever a single plaintiff's claims against multiple defendants, courts also apply the presumption it describes to motions to sever multiple plaintiffs' claims against a single defendant.  *See, e.g.*, *Engler v. Harris Corp.*, Civil No. GLR-11-3597, 2012 WL 5193818, at *3–4 (D. Md. Oct. 18, 2012).

Hudock's and Vauls' claims would risk answering those overlapping questions inconsistently and burden the parties, witnesses, and court with redundant discovery and motions. Consolidation is "clearly" proper where, as here, multiple plaintiffs bring separate claims "against the same defendant, relying on the same witnesses, alleging the same misconduct, and answered with the same defenses." *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 981 n.2 (4th Cir. 1997). At least on the present, not fully developed record, the Board's motion to sever will be denied.

## CONCLUSION

For the reasons stated above, the court will limit Hudock's and Vauls' damages under the ADEA, Maryland Declaration of Rights, and Section 1981 to $100,000. The remainder of the Board's motion to dismiss or for summary judgment will be denied, and the remainder of Hudock's and Vauls' Rule 56(d) motion will be granted. The Board's motion to sever will be denied.

A separate order follows.


March 16, 2015                                   _____/S/_____
Date                                            Catherine C. Blake
                                                United States District Judge